# EXHIBIT A

SEATTLE HOUSING AUTHORITY ADA-504 COMMITTEE
ON THE APPEAL OF
TONY ROQUE

I.   Background

Tony Roque (Resident) resides in the Raven Terrace building at Yesler Terrace and has disabling conditions that require the assistance of a caregiver. Raven Terrace property management staff became aware of Mr. Roque's condition and his need for parking for his caregiver. The property managers contacted the Housing Authority's ADA Coordinator who asked Mr. Roque to have his physician submit a description of his disabilities and the accommodation(s) needed. The physician responded that Mr. Roque is bed bound and has *a* care provider who "assists him with his activities of daily living." and her "efficiency carrying multiple bags and supplies" would be improved "by being able to park in the parking garage." As an accommodation he asked that Mr. Roques caregiver, "Ms. Fatuma Mohamud be able to park in the garage at Raven Terrace." On April 11, 2020 the Seattle Housing Authority (SHA) ADA-504 Committee reviewed and denied Resident's accommodation request finding: (1) that the primary beneficiary of the accommodation was his care provider, who is not disabled; and (2) that the requested accommodation would provide no meaningful relief from his disability or measurably improve his ability to live as other residents who are not disabled. Resident filed a timely appeal of the Committee's decision.

II.   The ADA-504 Committee Hearing

On June 8, 2020 the ADA-504 Committee heard Resident's appeal. Resident was represented by Conrad Reynoldson and Bonnie Fong of the Washington Civil and Disability Advocate who testified on Resident's behalf. Resident responded to questions from Committee members. Based upon the testimony and written material submitted, the Committee finds that:

1. Resident has a Housing Choice voucher and lives in a Seattle Housing Authority (SHA) owned tax credit unit at 820 Yesler Way, #813.
2. With his Housing Choice voucher, Resident can rent a unit anywhere in the country.
3. Resident is quadriplegic with multiple related complications.
4. In a declaration submitted to the Committee for its consideration at the hearing, the physician who submitted the initial accommodation request elaborated on the previous request as follows:

"Mr. Roque is limited in many major life activities including but not limited to: walking, eating, going to the bathroom, drinking, caring for one's self, performing manual tasks, standing, lifting, and bending. Furthermore, Mr. Roque has high blood pressure, neurogenic bowel and bladder, history of recurrent urinary tract infections, recurrent decubitus skin ulcers requiring several surgeries and history of depression. Mr. Roque *required* 24 hour per day care from care providers and

visiting nurses. (Emphasis added) Mr. Roque's visiting nurses perform life-sustaining tasks for Mr. Roque such as checking his blood pressure, heart rate, temperature, checking his skin for breakdown, changing his catheter monthly and assisting with repositioning his body and transfers. Mr. Roque's care providers perform life-sustaining tasks for Mr. Roque such as repositioning his body every 30 minutes, transferring him from bed to wheelchair and back, bathing him and assisting him with bowel movements."

5. According to Mr. Roque, he has two care providers: one arrives at 9:00 am and leaves at approximately 5:00 pm; the other arrives at approximately 9:00 pm and leaves at between 5:00 and 6:00 am. Mr. Roque also is seen by a visiting nurse every 10-14 days for approximately 30 minutes, but from 5:00 am until 9:00 am and from 5:00 pm until 9:00 pm Mr. Roque is generally unattended.
6. Resident's care providers are required to report for work at 9:00 am and 9:00 pm.
7. Although Mr. Roque may have required twenty-four hour a day care at one time, he is now unattended for eight hours a day and apparently does not require twenty-four hour a day care. This belies his physician's statement that he requires care 24 hour a day and must be repositioned every 30 minutes.
8. Resident previously qualified for a full time live-in aide but now prefers his current two care giver arrangement and does not want a full time live-in-aide.
9. According to the Washington State Department of Social and Health Services, a person in Resident's condition is eligible for a full-time live-in aide.
10. There are 83 units and 33 parking spaces at Raven Terrace, six of which are reserved. The spaces that are not reserved are used by residents on a first come, first served basis. When Resident moved into Raven Terrace he requested parking for a care provider. At that time he was informed, and acknowledged, that there are no reserved or assigned parking spaces for residents.
11. When no spaces are available, residents frequently park in reserved spaces, as did Resident's care provider on more than one occasion.
12. Staffing at Raven Terrace does not allow for regular monitoring of reserved parking spaces. This is particularly true under current conditions, as SHA's COVID-19 workplace protocols call for limited staff to be present in the office. Currently, Property Management staff rotate through in-office assignments so that only one-third the number of staff is present at one time. In addition, property management staff are generally not at the building between 8:00 pm and 7:00 am.
13. When property management is informed that a vehicle is parked in a reserved parking space a property manager, as staffing allows, places a on the vehicle stating that the vehicle will be towed if it is not removed from the reserved space. If the vehicle is not removed, a tow company is contacted and the vehicle is towed from the property. Tow truck arrival times are not within property management's control. Trucks arrive when scheduled by the tow company, which can be hours after the tow is requested.
14. To assure the availability of a reserved parking space for resident's care providers at 9:00 am and 9:00 pm, property management would be obligated to check the reserved space constantly every day between 8:00 am and 9:00 am and between 8:00 pm and 9:00 pm. In addition, property management would be required to

have a tow truck on call during those times. To assure that a reserved space is available 24 hours a day, as Resident has requested, property management would be required to monitor the space 24 hours a day and have towing services available 24 hours a day.

Based upon the above findings, the Committee concludes as follows:

1. Resident is disabled.
2. Although a reserved parking space may be desirable and convenient, nothing in the information submitted demonstrates that a reserved parking space is essential for Resident to live in, and enjoy the benefits of, his housing in the same manner and to the same extent as building residents who are not disabled.
3. Inasmuch as Resident does not need or want 24 hour care, Resident's care providers, who are not disabled, would be the primary beneficiaries of a reserved parking space.
4. Because Raven Terrace residents frequently park in reserved parking spaces, a reserved parking space provides no assurance that a parking space will be available when Resident's care providers arrive for work.
5. Requiring Raven Terrace staff to constantly monitor a reserved space to assure its availability for Resident's care providers would require a commitment of staff resources that would fundamentally interfere with the operation of the building.
6. If Resident's care providers needed to provide essential care at specific times the benefit of a reserved parking space would be illusory and potentially dangerous because the reserved parking space may or may not be available when needed. When the space was not available, care providers would be unable to provide the essential care in a timely manner. To be certain of a timely arrival, care providers would be obligated to allow time for finding another parking space, defeating the purpose of a reserved parking space.
7. As regards Resident's disability a reserved parking space is an ineffective accommodation and therefore not a reasonable.

III.   Decision

Based upon the foregoing, Resident's request for a reserved parking space at Raven Terrace is denied. As an alternative accommodation, SHA will allow Resident to transfer to a comparable unit in a SHA owned building or a privately owned building of his choosing with ample parking for residents and guests. Should Resident secure a full time live-in-aide, he will be provided a two bedroom Housing Choice voucher.

Dated this 17th day of June, 2020

By _____
James E. Fearn, Chair
Seattle Housing Authority, ADA-504 Committee